IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,<br>4613 University Drive<br>Durham, NC 27707<br><br>*Plaintiff*,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>*Defendants*. | Civil Action No. 1:26-cv-01386 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Blue Cross and Blue Shield of North Carolina ("Blue Cross NC") brings

this suit against Defendants the United States Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Centers for Medicare & Medicaid Services ("CMS"); and Mehmet Oz, in his official capacity as Administrator of CMS, and alleges as follows:

## PRELIMINARY STATEMENT

1. Blue Cross NC brings this action to remedy CMS's unlawful determination of its 2027 Star Rating in flagrant violation of CMS's governing statute.

2. Blue Cross NC is the only not-for-profit health insurer based in North Carolina, offering a broad range of health insurance plans and services to more than 4.5 million members.

3. For more than 90 years, Blue Cross NC has worked to address the State's most pressing healthcare challenges, with a focus on making high-quality healthcare more affordable, accessible, and easier to navigate.

4. Blue Cross NC serves members across all 100 North Carolina counties, from the mountains to the coast. Through its broad geographic reach and extensive network of healthcare providers, Blue Cross NC seeks to ensure that its members have access to quality healthcare regardless of where they live.

5. As a not-for-profit health insurer, Blue Cross NC is driven by its commitment to its members rather than shareholders. Through partnerships with community organizations, data-driven investments, and targeted initiatives, Blue Cross NC seeks to address critical healthcare challenges, including youth mental health and food insecurity.

6. Blue Cross NC also offers Medicare Advantage plans designed to provide seniors with affordable, accessible, and high-quality healthcare coverage.

7. Through the Medicare Advantage program, Congress authorized the Secretary of HHS, acting through CMS, to contract with private health plans like Blue Cross NC to provide Medicare-covered benefits that meet or exceed the benefits provided by government-run Medicare. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 275-327 (1997).

8. Each plan's "Star Rating" is an important tool that Congress provided to promote competition among Medicare Advantage health plans. A plan's Star Rating is a score of between 1 and 5 Stars, including half-Stars in between, on a range of quality measures for each plan, and is intended to promote transparency as to plan quality and help seniors to choose high-quality plans.

9. A plan's Star Rating not only is critical to a plan's market position, but it also determines the payments that the plan receives from CMS for providing healthcare services to members.

10. By statute, the financial consequences from just a single half-Star change in a plan's overall Star Rating can easily amount to hundreds of millions of dollars for an individual plan, and, taken together across all plans, billions of dollars across the Medicare Advantage program. Moreover, Medicare beneficiaries, agents, and brokers rely on Star Ratings to compare plans and inform enrollment decisions. Consistent application of the statutory requirements governing Star Ratings is therefore essential not only to plan

payments and competition, but also to ensuring that beneficiaries can rely on the Star Ratings as meaningful and comparable measures of plan quality.

11. Congress directed CMS to determine Star Ratings based on clinically validated measures of healthcare quality, such as the percentage of plan members who receive medically recommended preventive screenings. Blue Cross NC shares Congress's vision for transparent, easy-to-understand Star Ratings that allow seniors to make informed decisions and select the plans that provide the highest standards of clinical care and outcomes to American seniors.

12. Yet CMS has completely departed from Congress's vision of leveraging predictable, valid measures developed with input from providers, plans, and the public.

13. Rather than codifying consistent, stable specifications for its chosen measures in the Code of Federal Regulations through notice-and-comment rulemaking as CMS's enabling statute requires, CMS has instead promulgated its measures and their specifications as hundreds of pages of unilateral, sub-regulatory guidance, known as "Technical Notes," that CMS purports to modify each and every year at its discretion.

14. Congress's own nonpartisan advisory body, the Medicare Payment Advisory Commission, has confirmed that the resulting system is "overly complex," "distributes financial rewards inequitably," and "reports inaccurate information on quality."[1]

---

[1] Medicare Payment Advisory Comm'n, Replacing the Medicare Advantage Quality Bonus Program, in Report to the Congress: Medicare and the Health Care Delivery System, ch. 3 at 51 (June 2020), https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun20_ch3_reporttocongress_sec.pdf.

15. Indeed, federal courts have begun to take notice of CMS's stark departures from the quality system that Congress envisioned.

16. In 2024, two different judges held that CMS's unilateral changes in CMS's required benchmarks for "good" performance violated CMS's own regulations. *See SCAN Health Plan v. HHS*, No. 1:23-cv-3910-CJN, 2024 WL 2815789, at *1 (D.D.C. June 3, 2024) (Nichols, J.); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 25 (D.D.C. 2024) (Moss, J.).

17. As those cases identified, CMS had suddenly changed the rules on plans for what constituted "5-Star" or "4-Star" or "3-Star" performance at the last moment *after* plans had already designed their benefits to conform to CMS's requirements and *after* the quality data at issue had already been collected from plans, violating CMS's own binding regulations in the process.

18. Two years later, on May 27, 2026, the United States District Court for the Southern District of Georgia issued a detailed, 70+ page opinion holding that CMS's ever-shifting regulatory approach, now in determining a plan's 2026 Star Ratings, suffered multiple similar infirmities. *Clover Ins. Co. v. HHS*, No. 2:25-cv-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026).

19. First, the court found that ten of CMS's Star Ratings measures fell totally outside the statutory authority Congress granted CMS to adopt measures of plan quality. *Id.* at *8-14.

20. Second, the court held that a separate set of ten measures was procedurally

invalid because CMS never promulgated those measures "by regulation" as required by 42 U.S.C. § 1395hh(a)(2) for such measures that govern payments to plans for their services. *Id.* at *22-25.

21. On June 17, 2026, CMS announced that it would recalculate Star Ratings by applying the *first* holding in *Clover* (the removal of the ten measures that the court had identified as in excess of CMS's statutory authority) to certain plans and offering them the option, but not the requirement, to "opt into" a recalculated Star Rating under that first holding. CMS, *Update to 2027 Quality Bonus Payment Determinations* (June 17, 2026) ("Recalculation Memo").[2]

22. CMS, however, inexplicably refused to give all plans the benefit of the *second* holding from the Southern District of Georgia, namely, the removal of the ten measures that the court had identified as having been promulgated by CMS in its unilateral program guidance, rather than "by regulation" in the manner required by 42 U.S.C. § 1395hh(a)(2).

23. Recognizing that the Southern District of Georgia's second holding was plainly correct, three health insurance plans each separately sued CMS in 2026, seeking to vacate their respective 2026 Star Ratings and require CMS to recalculate them without reliance on the measures in *Clover*'s second holding, with corresponding rebate relief. *SCAN Health Plan v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02391-CRC, ECF

[2] CMS also removed some measures that it apparently concluded (without explanation) were encompassed by the reasoning of the first *Clover* holding despite the Georgia federal court not reaching them. *Id.*

Nos. 1, 11 (D.D.C. 2026); *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02441-CRC, ECF Nos. 1, 13 (D.D.C. 2026); *Elevance Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 2:26-cv-00061-LGW-BWC, ECF Nos. 1, 46 (S.D. Ga. 2026).

24. This action arises from the same two defects, applied in determining the next year's Star Ratings: CMS has used seventeen measures (known as C27, C28, C30, C31, C32, D01, D02, D03, D05, D06, D07, D08, D09, D10, D11, D12, D13) in calculating Blue Cross NC's 2027 Star Ratings without first promulgating them "by regulation," as Congress expressly required. Moreover, those same seventeen measures exceed the statutory authority Congress granted CMS, in violation of the separate statutory limitation recognized in *Clover*. CMS's continued reliance on these two sets of measures for 2027 presents the same legal questions, governed by the same statutory requirements that controlled in *Clover*.

25. Under 42 U.S.C. § 1395hh(a)(2), any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits," must be promulgated "by regulation," that is, formal rulemaking and publication in the Code of Federal Regulations.

26. The Supreme Court has recognized that Congress imposed this heightened procedural requirement on CMS precisely because of the dramatic consequences that

decisions regarding Medicare carry for the healthcare system as a whole. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).

27. As the Southern District of Georgia held, the ten measures that Clover challenged were required to be promulgated "by regulation." Because CMS had not done so, they could not be applied to Clover.

28. In particular, the court found the specifications for determining those ten measures amounted to "substantive legal standard[s]" that "govern[ed] the payment for services because they serve[d] as a 'deciding principle' for such payments." *Clover Ins. Co.*, 2026 WL 1483515, at *24.

29. That is, because Star Rating measures directly determine the statutorily prescribed payments that Medicare Advantage plans receive—often amounting to hundreds of millions of dollars for a single plan based solely on the plan's Star Rating—they establish substantive legal standards governing payment for services. *See id.*

30. Because the court found that the ten measures Clover challenged had not been promulgated "by regulation" through the statutorily prescribed notice-and-comment process, the court ordered CMS to recalculate Clover's Star Rating without reliance upon them. *Id.* at *25.

31. In addition, under 42 U.S.C. § 1395w-23(o)(4)(A), Congress has limited the data on which Star Ratings may be based to the "data collected under section 1395w-22(e) of this title," that is, the data for which a Medicare Advantage plan provides for the collection, analysis, or reporting as part of its quality improvement program.

32. As the Southern District of Georgia held, the restriction in § 1395w-23(o)(4)(A), "when read alongside surrounding statutory provisions in the Medicare Act, supports the conclusion that CMS may only base its quality rating calculations on measures using data collected under Section 1395w-22(e)." *Clover Ins. Co.*, 2026 WL 1483515, at *14.

33. Because CMS undisputedly based the Star Ratings on measures relying upon data outside of § 1395w-22(e), the court held that CMS erred in considering ten measures to calculate Clover's Star Rating.

34. On October 3, 2026, Blue Cross NC requested that CMS re-determine its 2027 Star Rating for Contract No. H3449 without reliance on the measures that were unlawful under the reasoning of the Southern District of Georgia's decision in *Clover*.

35. On October 7, 2026, CMS summarily denied the request. Accordingly, before finalizing Blue Cross NC's 2027 Star Rating, CMS was aware of the *Clover* decision, the three pending challenges to measures in *Clover*'s second holding, and Blue Cross NC's objection to their continued use. Nevertheless, despite multiple opportunities to cure these defects before finalizing the ratings, CMS again applied the challenged measures without promulgating their specifications through notice-and-comment rulemaking and continued to rely on data not collected under 42 U.S.C. § 1395w-22(e).

36. CMS's decision to assign Blue Cross NC a 2027 Star Rating of 4.0 Stars, rather than 4.5 Stars in accordance with the holdings in *Clover*, deprives Blue Cross NC of well over $25 million of statutorily mandated payments that Blue Cross NC could use to

increase benefits or reduce cost sharing for its members, improving its competitiveness and profitability.

37. And CMS's publication of a lowered Star Rating for Blue Cross NC also imposes reputational and competitive harms on it.

38. More fundamentally, Congress created the Star Ratings program to allow Medicare Advantage beneficiaries to make informed decisions about plan enrollment based on clinically validated measures of plan quality that had been subjected to notice and comment. CMS's contrary approach fails to carry out the vision that Congress set forth by statute.

39. Blue Cross NC thus brings this action and requests that the Court vacate its 2027 Star Rating for Contract No. H3449, and order CMS to recalculate that Star Rating without reliance on the unlawful measures identified herein.

40. That leaves the matter of timing. Historically, CMS took the position that it needed a decision in advance of the annual June Medicare Advantage bidding deadline to provide efficient and efficacious relief.[3] More recently, CMS has taken conflicting and

[3] *See Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 13 (D.D.C. 2024) ("Both parties have requested expedited consideration of . . . summary judgment in light of Plaintiffs' impending deadline to submit their bids to CMS for the upcoming contract year."); Joint Motion for Briefing Schedule at 1, *SCAN Health Plan v. Dep't of Health & Hum. Servs.*, No. 1:23-cv-3910-CJN (D.D.C. Feb. 23, 2024), ECF No. 19 ("The parties have developed this scheduling proposal to allow for expedited summary judgment briefing in advance of the June 3, 2024 deadline for Medicare Advantage bids . . . ."); Notice of Joint Proposed Briefing Schedule at 4, *Clover Ins. Co. v. Becerra*, No. 1:24-cv-01385-BAH (D.D.C. June 7, 2024), ECF No. 12 (similar).

inconsistent positions on this issue, including the necessary timing and willingness to take the necessary operational steps to award rebate relief required under the governing statute. Given this history, Blue Cross NC will seek to confer with Defendants on this issue to promptly establish an appropriate briefing schedule that allows for a final decision by May 2027.

## PARTIES

41. Blue Cross NC provides a full spectrum of health care plans and services and is an independent licensee of the Blue Cross and Blue Shield Association. It is incorporated in North Carolina and has its principal place of business in Durham, North Carolina.

42. HHS is a department of the Executive Branch of the United States. Its headquarters and principal place of business are at 200 Independence Avenue, S.W., Washington, DC 20201. Its governmental activities occur nationwide.

43. Robert F. Kennedy, Jr., sued solely in his official capacity, is Secretary of HHS. In this capacity, Secretary Kennedy has ultimate responsibility for activities at HHS, including the actions complained of herein. His governmental activities occur nationwide.

44. CMS is a federal agency within HHS. Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244. Its governmental activities occur nationwide.

45. Dr. Mehmet Oz, sued solely in his official capacity, is Administrator of CMS. In this capacity, Administrator Oz has ultimate responsibility for activities at CMS, including the actions complained of herein. His governmental activities occur nationwide.

## JURISDICTION, VENUE, AND EXHAUSTION

46. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

47. This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the United States Constitution. Blue Cross NC's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. §§ 701-706; and 28 U.S.C. § 1361.

48. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Blue Cross NC resides in this District. Venue is also proper in this District under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Blue Cross NC provides Medicare Advantage plans to thousands of seniors in this District. By unlawfully decreasing Blue Cross NC's 2027 Star Rating to 4.0 Stars and broadly publicizing that determination within this District, CMS has harmed Blue Cross NC's reputation and ability to attract and retain members in this District.

49. Any requirement for administrative exhaustion has been satisfied. CMS allows plans to examine the data used to calculate their Star Rating and appeal certain determinations. It does not, however, allow plans to challenge "the methodology for calculating the star ratings." 42 C.F.R. § 422.260(c)(3)(ii). Thus, any challenge to the lawfulness of measures applied to a plan is not subject to any administrative review process. *See SCAN Health Plan*, 2024 WL 2815789, at *4 n.3. Nevertheless, Blue Cross NC raised its concerns about the use of these measures to determine its 2027 Star Rating

to CMS through a submission on October 3, 2026, objecting to CMS's calculation of the 2027 Star Rating through application of seventeen disputed measures (C27, C28, C30, C31, C32, D01, D02, D03, D05, D06, D07, D08, D09, D10, D11, D12, D13) that had not been promulgated "by regulation" and also exceeded CMS's statutory authority. CMS responded on October 7, 2026, refusing to grant Blue Cross NC its requested relief or determine Blue Cross NC's Star Rating in accordance with its objections.

## BACKGROUND

### A. The Medicare Advantage Program

50. The Medicare program is the federal health insurance program for people aged 65 or older or with certain disabilities or end-stage renal disease. *See Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588 (Jan. 28, 2005); 42 U.S.C. § 1395kk(a).

51. Medicare is comprised of Parts A, B, C, and D. *See* 70 Fed. Reg. at 4589. Part A covers inpatient hospital treatment, and Part B covers outpatient services. Together, they are known as "traditional" or "original" Medicare.

52. Traditional Medicare uses a fee-for-service payment model. *See* 42 U.S.C. § 1395w-22(a)(1). CMS thus reimburses providers directly for the services they provide to traditional Medicare beneficiaries. *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).

53. Medicare Part C, also known as Medicare Advantage, uses a different model. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-

173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28).

54. In Part C, private companies, called Medicare Advantage organizations, offer plans. These companies must provide at least the same services that Medicare beneficiaries would receive through traditional Medicare. 42 U.S.C. § 1395w-22(a). But to attract enrollees, Medicare Advantage plans typically include additional benefits not covered by traditional Medicare, such as dental and vision benefits. *UnitedHealthcare Ins. Co.*, 16 F.4th at 872.

55. Under this public-private partnership model, Medicare Advantage organizations do not receive fee-for-service reimbursements from CMS for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a).

56. Instead, they receive a per-enrollee monthly payment to provide all Medicare-covered services to the beneficiaries enrolled in their plan. *Id.*

57. CMS determines a plan's monthly payment by comparing the plan's "bid" (its estimated cost of providing Medicare-covered services to a particular patient population) to a "benchmark" (the maximum amount the federal government will pay to provide coverage in the plan's service area). *Id.* § 1395w-23(b)(1)(B), (n).

58. If the Medicare Advantage organization's bid is below the benchmark, CMS pays the organization its bid, while returning a specified percentage of the difference between the benchmark and the bid as a "rebate," which the Medicare Advantage organization uses to provide additional benefits or otherwise return to plan participants through lower premiums or cost sharing (among other things). 42 U.S.C. §§ 1395w-

23(a)(1)(B)(i), (E); 1395w-24(b)(1)(C).

59. If, in contrast, an organization's bid is at or above the benchmark, the Medicare Advantage organization receives monthly payments at the benchmark rate, and the Medicare Advantage organization must charge enrollees an additional premium to cover the amount by which the bid exceeds the benchmark. *Id.* §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A); *see also Medicaid & Medicare Advantage Products Ass'n of P.R. v. Emanuelli Hernández*, 58 F.4th 5, 8 n.1 (1st Cir. 2023); *Elevance Health, Inc.*, 736 F. Supp. 3d at 5-6.

60. Typically, plans aim to bid, and do in fact bid, meaningfully below the benchmark, in order to remain competitive both on premiums and in funding supplemental benefits. (This is true of Blue Cross NC's plan at issue in this case.)

61. As detailed below, Star Ratings are the overriding determinant of each Medicare Advantage organization's plan-specific benchmark and rebate percentage, and, thus, Star Ratings determine the payments to the plan for the services it provides, and the benefits it can offer.

62. Indeed, just a half-Star increase can and does result in hundreds of millions of dollars in additional funding for a single plan, and billions of dollars across all plans.

63. In addition to inpatient treatment and outpatient services through traditional Medicare or Medicare Advantage, Medicare beneficiaries may also obtain prescription drug coverage through Medicare Part D.

64. Like the Medicare Advantage program, the Part D prescription drug benefit

provides coverage through a public-private partnership with plan sponsors.

65. These plan sponsors offer both standalone prescription drug plans for individuals enrolled in traditional Medicare and drug coverage bundled with a Medicare Advantage plan, known as a Medicare Advantage-Prescription Drug plan. 42 U.S.C. § 1395w-101(a)(1), (3)(C).

66. Since their adoption in 2003, the Medicare Advantage and Part D programs have grown steadily. Most Americans prefer the choices that Medicare Advantage plans provide compared with traditional Medicare, and voluntarily elect enrollment in Medicare Advantage.

67. The predecessor to Medicare Advantage had approximately 1.56 million enrollees in 1992. *See* CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report*, https://www.cms.gov/data-research/statistics-trends-and-reports/health-plans-reports-files-data/monthly. In recent years, that figure has increased to more than 35 million enrollees, surpassing the number of beneficiaries opting for traditional Medicare. Meredith Freed, et al., *Medicare Advantage in 2026: Enrollment Update and Key Trends* (June 5, 2026), https://www.kff.org/medicare/medicare-advantage-in-2026-enrollment-update-and-key-trends. And the Congressional Budget Office recently projected that 63% of Medicare beneficiaries would be enrolled in Medicare Advantage by 2034. *Id.*

**B. The Star Ratings System**

68. Each Medicare Advantage organization is required to establish "ongoing quality improvement program[s]." 42 U.S.C. § 1395w-22(e)(1), (3).

69. The Medicare Advantage statute prescribes a system of "quality rating[s]" for plans under a "5-star rating system," based on the data collected under Medicare Advantage organizations' quality improvement programs. *Id.* § 1395w-23(o)(4)(A).

70. Star Ratings are based on the scores that these plans earn on various quality and performance "measures." *See* 42 C.F.R. §§ 422.162(a), 423.182(a).

71. CMS first determines each plan's raw scores on each measure.

72. CMS then converts the raw scores into measure-level Star Ratings, and from there calculates each plan's overall Star Rating by running a weighted average of all measures. *See SCAN Health Plan*, 2024 WL 2815789, at *1-2.

73. Each plan receives a numerical score for each applicable measure, which CMS converts into a "measure-level" Star Rating on a five-star scale.

74. The scale uses four thresholds, or "cut points," to divide the measure scores into five "whole star increments." 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4).

75. From the measure-level Star Ratings, CMS calculates Part C and Part D "summary" ratings, which reflect the weighted mean of a contract's measure-level Star Ratings, with some measures counting more than others. *Id.* §§ 422.166(c), 423.186(c).

76. The Affordable Care Act incorporated Star Ratings into two statutory formulas that determine payments to Medicare Advantage plans. *See* Pub. L. No. 111-152, § 1102(c)-(d), 124 Stat. 1029, 1043-46 (2010).

77. The first formula, codified at 42 U.S.C. § 1395w-23(o) and known as the quality bonus payment, rewards Medicare Advantage plans rated 4.0 Stars or higher with an increased 5 percent benchmark against which to bid.

78. That effectively either increases the total amount of money the plan is eligible to receive, including in the form of a rebate (if its bid is below the benchmark) or reduces the premium the plan must charge its members (if its bid is above the benchmark).

79. The second formula, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate as follows: 3 Stars and lower receive 50 percent; 3.5 and 4.0 Stars receive 65 percent; and 4.5 and 5 Stars receive 70 percent. Rebates are used to lower patient cost sharing and premiums, and fund supplemental benefits not offered under traditional Medicare, such as dental and vision benefits. *See, e.g.*, 85 Fed. Reg. 33,796, 33,885-86 (June 2, 2020).

80. Congress provided that the "quality rating for a plan shall be determined according to a 5-star rating system (based on the *data collected under section 1395w-22(e) of this title*)." 42 U.S.C. § 1395w-23(o)(4)(A) (emphasis added).

81. That is, Congress required the Star Ratings to be based upon the data collected under plans' quality assurance programs as of November 1, 2003. *Id.* § 1395w-22(e)(3)(B)(i).

82. In this way, Congress required CMS to focus on well-established types of data concerning clinical quality, health outcomes, and beneficiary satisfaction. *See id.*

83. CMS prominently displays Star Ratings in its online and print resources concerning available Medicare Advantage plans.

84. Through the online Medicare Plan Finder tool, which provides information to beneficiaries about available plans, CMS displays Medicare Advantage plans to prospective enrollees in order of highest to lowest Star Ratings to guide beneficiaries to higher-rated plans first.

85. Medicare beneficiaries use the Star Ratings to assess the quality of the Medicare Advantage plans; and agents and brokers use the Star Ratings in assisting beneficiaries in selecting a plan that fits their health care needs. *Elevance Health, Inc.*, 736 F. Supp. 3d at 6-7.

86. Star Ratings thus influence each plan's position in the marketplace, by affecting how prospective enrollees perceive the comparative quality of various plans.

87. Star Ratings also determine whether a low-performing plan remains eligible to continue to participate in the program. *See* 42 C.F.R. §§ 422.502(b), 423.503(b).

**C. Notice And Comment On The Star Ratings Measures**

88. Pursuant to its unilateral program guidance, CMS considers 40 or more distinct "measures" of a plan's quality to derive the plan's Star Ratings from year to year.

89. CMS breaks those measures into multiple categories. Some measures reflect such issues as the plan's success in delivering preventive care like cancer screenings, and health outcomes of plan participants with respect to such conditions as blood pressure. Other measures rely on data drawn from a family of patient-experience surveys, known as

the Consumer Assessment of Healthcare Providers & Systems ("CAHPS") surveys. Still other measures are CMS "administrative" measures about issues like the time it takes to process coverage appeals.

90. Critically, under CMS's current methodology, Star Ratings measures, and the specifications for *how* the measures are calculated (determined) by CMS, change each year.

91. Due to these "regular updates and revisions," CMS does not codify its Star Ratings measures in the Code of Federal Regulations, but rather lists out its measures for a given year in its annual Technical Notes. 83 Fed. Reg. 16,440, 16,537 (Apr. 16, 2018).

92. The Technical Notes provide a partial, summary description of the specifications for each measure, *i.e.*, the data sources on which it is based and how it is determined.

93. To actually determine each measure, however, it is necessary to utilize the detailed specifications contained in CMS's other sub-regulatory guidance, including specific "Technical Notes" pertaining to each measure. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (partially specifying calculation of two measures, among other sources of guidance).

94. For the 2027 Star Ratings, CMS utilized 32 measures for Part C ("C01-C32") and 13 measures for Part D ("D01-D13"). *See* CMS, *2027 Star Ratings Measures & Weights*, https://www.cms.gov/files/document/2027-star-ratings-measures.pdf.

95. Before evaluating a plan with a given Star Ratings measure, CMS must undertake public notice-and-comment rulemaking concerning that measure. This obligation stems from two separate sources of law relevant to this case.

96. *First*, since 2018, CMS's regulations have provided that, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must first publicly propose the measure (on its website), elicit public feedback prior to the measurement year, *and then* formally engage in notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act [42 U.S.C. § 1395w-23] and then subsequently will propose and finalize new measures through rulemaking."); *id.* § 423.184(c)(2) (same for Part D); *id.* §§ 422.164(d)(2), 423.184(d)(2) (same procedure applies for substantial changes to measures).

97. Because the majority of CMS's Star Rating measures predate CMS's 2018 regulations requiring notice-and-comment rulemaking, most have not undergone rulemaking.

98. Moreover, CMS has taken the position that this regulatory notice-and-comment obligation does *not* require *traditional* notice-and-comment rulemaking in the normal APA sense when CMS *changes* a measure or its specifications, *i.e.*, disclosing CMS's intended changes and updates to measures and seeking comment on those changes, but rather merely requires CMS to provide notice to the public that it intends to do

*something*—anything—to change the measure, and then CMS can do as it wishes to change the measures, regardless of whether that change is a logical outgrowth of CMS's original proposal. *See* Defs.' Mot. For Summ. J. at 23-24, *Clover Ins. Co. v. HHS*, No. 2:25-cv-142 (S.D. Ga. Apr. 9, 2026), ECF No. 51.

99. *Second*, CMS has a statutory obligation to promulgate Star Ratings measures "by regulation," *i.e.*, through notice-and-comment rulemaking and promulgation in the Code of Federal Regulations.

100. CMS must promulgate "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter" pursuant to 42 U.S.C. § 1395hh(a)(2). *Allina*, 587 U.S. at 569-70 (recognizing that "Congress chose to write a new, Medicare-specific" "notice-and-comment regime" under § 1395hh).

**D. The Clover Lawsuit And Decision Of The Southern District Of Georgia**

101. On November 7, 2025, Clover filed suit in the United States District Court for the Southern District of Georgia, challenging the application of a number of measures used to calculate the 2026 Star Ratings. Compl., *Clover Ins. Co. v. HHS*, No. 2:25-cv-142 (S.D. Ga. Nov. 7, 2025), ECF No. 1.

102. Clover challenged its 2026 Star Rating—which determines payments to the plan for plan year 2027. *See id.*

103. The Southern District of Georgia ultimately granted in part Clover's motion for summary judgment, based on two primary holdings. *See Clover Ins. Co.*, 2026 WL 1483515, at *1.

104. First, the Southern District of Georgia held that ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they exceeded CMS's statutory authority under 42 U.S.C. § 1395w-23(o) and § 1395w-22(e). *Id.* at *8-14.[4]

105. Examining the statutory text, structure, and purpose, the court held that the requirement to "base[]" the Star Ratings on data collected under § 1395w-22(e) prohibited CMS from considering measures that incorporated data sources outside § 1395w-22(e). *Id.*

106. Because the ten challenged measures (known as Medication Adherence, Diabetes; Medication Adherence, Hypertension; Medication Adherence, Cholesterol; Call Center – Foreign Language Interpreter and TTY Availability (Part C); Call Center – Foreign Language Interpreter and TTY Availability (Part D); Reviewing Appeals Decisions; Rating of Drug Plan; Getting Needed Prescription Drugs; Medication Therapy Management Completion; and Pharmacy Statin Use with Diabetes)[5] relied on data not

[4] In a separate holding, that court determined that CMS is required to maintain measures that are based on the "types of data" CMS used in 2003, rather than new types of data post-dating 2003, but that CMS had not violated that mandate with respect to the 3 specific measures Clover challenged on that ground. *Clover Ins. Co.*, 2026 WL 1483515, at *15-21 (citing 42 U.S.C. § 1395w-22(e)(3)(B)(i)).

[5] The numerical designations assigned to these measures varied slightly in the 2026 Star Ratings year as compared to the 2027 Star Ratings year, but the measures themselves remained unchanged.

collected under § 1395w-22(e), the court concluded CMS exceeded its statutory authority by including those measures in calculating Clover's 2026 Star Rating. *Id.*

107. Second, that court held that ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2). *Id.* at *22-25.

108. More specifically, Congress provided a specific notice-and-comment requirement for Medicare, providing that any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive" such benefits, must be promulgated "by regulation," *i.e.*, published in the Code of Federal Regulations and subjected to notice and comment. 42 U.S.C. § 1395hh(a)(2).

109. The Southern District of Georgia correctly held that Star Ratings measure specifications qualify as "statement[s] of policy" for purposes of § 1395hh(a)(2), a point that CMS did not dispute. *See Clover Ins. Co.*, 2026 WL 1483515, at *22 (citing *Allina*, 587 U.S. at 572).

110. "Star Ratings measure specifications qualify as statements of policy" that must be promulgated by regulation under § 1395hh(a)(2) because they "let the public know

the agency's current adjudicatory approach to a critical question involved in calculating ratings for M[edicare] A[dvantage] plans nationwide." *Id.*

111. The court also correctly held that, with respect to the ten measures that Clover challenged on this ground (known as Annual Flu Vaccine, Improving or Maintaining Physical Health, Improving or Maintaining Mental Health, Reducing the Risk of Falling, Improving Bladder Control, Getting Needed Care, Getting Appointments and Care Quickly, Customer Service, Rating of Health Care Quality, and Care Coordination), those measures' specifications each provided a "substantive legal standard," a point that CMS, again, did not contest. *Id.* at *22-23.

112. The measure specifications constitute a "substantive legal standard" because "CMS's Star Rating calculations function to define the scope of [Medicare Advantage organizations'] legal rights to rebates by impacting the percent of per capita savings a plan can receive." *Id.* at *23.

113. Finally, the court found that the subject standards did in fact "govern the payment for services because they serve as a 'deciding principle' for such payments." *Id.* at *24 (quoting *Govern*, Webster's III New Int'l Dictionary 982).

114. As the court explained, "CMS is . . . obligated by statute to offer additional funding to plans with better Star Ratings" and "[t]he fact that the ratings trigger statutorily mandated funding increases is more than mere influence or an indirect effect; it is a deciding principle in the payment amount." *Id.*

115. Therefore, CMS's decision to use the ten disputed measures to determine Clover's 2026 Star Rating "trigger[ed] the notice-and-comment requirements in Section 1395hh(a)(2)," and CMS's failure to engage in the required notice-and-comment rulemaking with respect to those measures made the calculation of Clover's 2026 Star Rating with these measures procedurally invalid. *Id.* at *25.

### E. CMS's Recalculation Of The 2026 Star Ratings

116. Given plans' experience with a "recalculation" that occurred following the 2024 *SCAN* and *Elevance* cases, plans were closely watching *Clover* with the expectation that, if that case were resolved in Clover's favor, CMS was likely to engage in a similar recalculation for all plans.

117. That expectation was not fulfilled by CMS.

118. CMS's second recalculation occurred 3 weeks after the *Clover* court's ruling, as of June 17, 2026.

119. On that date, CMS issued a memorandum, announcing an update to the 2026 Star Rating calculations (which impact 2027 plan payments) in light of the *Clover* decision, and that CMS had issued recalculated Star Ratings for certain plans. Recalculation Memo at 1.

120. The memorandum explained that CMS "recalculated the 2027 [Star] ratings for MA [Medicare Advantage] organizations using only data collected under 42 U.S.C. § 1395w-22(e) as of November 1, 2003," in accordance with the *Clover* court's first holding. *Id.* (CMS also removed certain measures that it apparently believed were embraced by the

reasoning of that first holding, even though the *Clover* court did not rule on those measures).

121. The memorandum also invited plans whose overall Star Ratings had increased as a result of the recalculation to resubmit their bids for plan year 2027, in light of the significant revenue effects that the Star Ratings changes would have on the bids.

122. However, the Recalculation Memo did not provide for a recalculation removing the additional ten measures impacted by the Southern District of Georgia's decision—specifically the measures that the *Clover* court held invalid because CMS had not promulgated those measures "by regulation." *Compare* Recalculation Memo, *with Clover Ins. Co.*, 2026 WL 1483515, at *22-25.

123. After CMS issued the Recalculation Memo, three additional plans sued CMS, alleging that CMS unlawfully calculated their 2026 Star Ratings using measures that had not been promulgated through notice-and-comment rulemaking. *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02441-CRC, ECF Nos. 1, 13 (D.D.C. 2026); *SCAN Health Plan v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02391-CRC, ECF Nos. 1, 11 (D.D.C. 2026); *Elevance Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 2:26-cv-00061-LGW-BWC, ECF Nos. 1, 46 (S.D. Ga. 2026). Those suits remain pending.

### F. CMS Unlawfully Determines Blue Cross NC's 2027 Star Ratings

124. On October 8, 2026, CMS issued Blue Cross NC's 2027 Star Ratings at 4.0 Stars for Contract No. H3449.

125. Despite the Southern District of Georgia's decision in *Clover*, CMS unlawfully determined Blue Cross NC's 2027 Star Rating using seventeen unlawfully promulgated measures (C27, C28, C30, C31, C32, D01, D02, D03, D05, D06, D07, D08, D09, D10, D11, D12, D13), which also exceeded CMS's statutory authority.

126. In determining Blue Cross NC's 2027 Star Rating, CMS utilized measures without adopting those measures' specifications as regulations through required notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2).

127. Under the Medicare Act, "no rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2).

128. CMS's Star Ratings measures determine CMS's payments to Blue Cross NC, Blue Cross NC's benefits offered to beneficiaries, Blue Cross NC's payments to providers, and Blue Cross NC's eligibility to participate in the Medicare Advantage program. *Id.* §§ 1395w-23(o)(1); 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.260, 422.266(a)(2)(ii); *SCAN Health Plan*, 2024 WL 2815789, at *1 (highlighting that CMS is "obligated" to "offer additional funding to plans with better Star Ratings" and "higher-rated plans can then use

those extra funds to lower costs for their beneficiaries or to provide them with additional benefits").[6]

129. In addition, CMS terminates plans that have Part C Star Ratings below three Stars for three consecutive years. *See* 42 C.F.R. § 422.510(a)(4)(xi).

130. The specification of each of the Star Ratings measures identified herein thus amounts to a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (recognizing that HHS's measures "used to calculate the payment that providers will receive for providing healthcare services to low-income patients" fell under § 1395hh(a)(2)), *aff'd*, 587 U.S. 566 (2019).

131. Because the specification of each Star Ratings measure determines "the scope of benefits" and "payment for services," and Blue Cross NC's "eligibility" to participate in Medicare Advantage, these measures must be promulgated "by regulation." *See* 42 U.S.C. § 1395hh(a)(2).

132. Consistent with § 1395hh(a)(2), CMS has codified in the Code of Federal Regulations almost every material aspect of its Star Rating system, including procedures governing how the Star Ratings are calculated. *See generally* 42 C.F.R. §§ 422.160-166,

[6] The Star Ratings also impact Blue Cross NC's ability to expand its operations, and the ability to enroll members year-round at the higher Star Rating levels.

423.180-186.

133. But CMS has chosen to treat the *specification* of *measures* differently, on the theory that publishing measure specifications as regulations in the Code of Federal Regulations would diminish CMS's ability to morph these specifications from year to year. 83 Fed. Reg. at 16,537 ("CMS will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated [by CMS].").

134. The problem with CMS's failure to codify the measures' specifications as regulations through notice-and-comment-rulemaking is that Congress requires CMS to do so. 42 U.S.C. § 1395hh(a)(2) ("No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).").

135. CMS did not promulgate "by regulation" *any* of the specifications for the following measures that it applied to Blue Cross NC in determining Blue Cross NC's 2027 Star Ratings:

- Complaints about the Health Plan (C27),
- Members Choosing to Leave the Plan (C28),
- Plan Makes Timely Decisions About Appeals (C30),
- Reviewing Appeals Decisions (C31),

- Call Center – Foreign Language Interpreter / TTY (C32),
- Call Center – Foreign Language Interpreter / TTY (D01),
- Complaints about the Health Plan (D02),
- Members Choosing to Leave the Plan (D03),
- Rating of Drug Plan (D05),
- Getting Needed Prescription Drugs (D06),
- MPF Price Accuracy (D07),
- Medication Adherence for Diabetes Medication (D08),
- Medication Adherence for Hypertension (D09),
- Medication Adherence for Cholesterol (D10),
- Pharmacy Statin Use with Diabetes (D11),
- Concurrent Use of Opioids and Benzodiazepines (D12),
- Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults (D13).

136. Moreover, even if CMS were to take the position that promulgating these measures' specifications "by regulation" is met by publishing these measures in the Federal Register, CMS did not do that, either.

137. To be sure, CMS has listed out the names and high-level descriptions of the measures in prior Federal Register announcements. But CMS has not provided in the Federal Register the specifications for how the measures are determined. 83 Fed. Reg. at 16,531-32.

138. To actually determine the Star Ratings measures each year, CMS must use,

at minimum, the summary specifications in CMS's Star Ratings Technical Notes, which CMS publishes annually, and potentially also the *detailed* specifications and Technical Notes for *each measure*, found in CMS's sub-regulatory guidance outside of the Star Ratings Technical Notes. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (partially specifying calculation of two measures).

139. So even if publication in the Federal Register sufficed to promulgate a standard "by regulation," CMS has failed to publish within the Federal Register the actual specifications necessary to determine the measures identified above.

140. As the D.C. Circuit explained, "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect*,' 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide shall contain only 'each Federal regulation of general applicability and current or future effect,' 1 C.F.R. § 8.1 (1986)." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986); *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (same).

141. Accordingly, CMS cannot apply the measures identified above to Blue Cross NC because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

142. CMS thus erroneously deprived Blue Cross NC of a 4.5 Star Rating for Contract No. H3449, instead leaving Blue Cross NC with a 4.0 Star Rating based on unlawfully promulgated measures.

143. Had CMS calculated Blue Cross NC's 2027 Star Rating without these seventeen unlawful measures, Blue Cross NC's Star Rating would have improved to 4.5 Stars for Contract No. H3449, entitling Blue Cross NC to a higher rebate percentage, resulting in well over $25 million, which would benefit Blue Cross NC and its members.

144. Moreover, Congress restricted CMS to calculating the Star Ratings "based on the data collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A).

145. Because § 1395w-22(e) governs the quality assurance programs that Medicare Advantage plans must maintain, Congress thus required CMS to base the Star Ratings on data collected under those quality assurance programs. *Id.* § 1395w-22(e)(3)(B)(i).

146. As the Southern District of Georgia recognized in *Clover*, this restriction, "when read alongside surrounding statutory provisions in the Medicare Act, supports the conclusion that CMS may only base its quality rating calculations on measures using data collected under Section 1395w-22(e)." *Clover Ins. Co.*, 2026 WL 1483515, at *14.

147. Yet CMS *admittedly* departed from these sources of data in calculating the Star Ratings. *E.g.*, 42 C.F.R. § 422.162(c)(1) (forthrightly stating "CMS bases Part C Star

Ratings on the type of data specified in section 1852(e) [§ 1395w-22(e)] and on CMS administrative data").

148. CMS relied on data not collected under 42 U.S.C. § 1395w-22(e) in calculating Blue Cross NC's 2027 Star Ratings for the following measures:

- Complaints about the Health Plan (C27),
- Members Choosing to Leave the Plan (C28),
- Plan Makes Timely Decisions About Appeals (C30),
- Reviewing Appeals Decisions (C31),
- Call Center – Foreign Language Interpreter / TTY (C32),
- Call Center – Foreign Language Interpreter / TTY (D01),
- Complaints about the Health Plan (D02),
- Members Choosing to Leave the Plan (D03),
- Rating of Drug Plan (D05),
- Getting Needed Prescription Drugs (D06),
- MPF Price Accuracy (D07),
- Medication Adherence for Diabetes Medication (D08),
- Medication Adherence for Hypertension (D09),
- Medication Adherence for Cholesterol (D10),
- Pharmacy Statin Use with Diabetes (D11),
- Concurrent Use of Opioids and Benzodiazepines (D12),
- Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults (D13).

149. Accordingly, CMS cannot apply the measures identified above to Blue Cross NC because they exceed CMS's statutory authority. *See* 42 U.S.C. § 1395w-23(o)(4)(A).

150. On this basis, as well, CMS erroneously deprived Blue Cross NC of a 4.5 Star Rating for Contract No. H3449, instead leaving Blue Cross NC with a 4.0 Star Rating based on these seventeen unlawful measures.

151. Had CMS calculated Blue Cross NC's 2027 Star Rating without these seventeen unlawful measures, Blue Cross NC's Star Rating would also have improved to 4.5 Stars for Contract No. H3449, entitling Blue Cross NC to a higher rebate percentage, resulting in well over $25 million, which would benefit Blue Cross NC and its members.

### G. Blue Cross NC Suffers And Will Continue To Suffer Harm From CMS's Unlawful Determination Of Its 2027 Star Rating

152. CMS's unlawful determination of Blue Cross NC's 2027 Star Rating at 4.0 Stars has harmed and will continue to harm Blue Cross NC and its members.

153. Blue Cross NC's Star Ratings are the determinative factor in calculating CMS's payments to Blue Cross NC, and for that matter, other Medicare Advantage plans.

154. A Star Rating of 4.0 Stars leaves Blue Cross NC ineligible for increased rebates for Contract No. H3449. This will result in a direct loss of over $25 million in 2028, that Blue Cross NC would have been entitled to with a 4.5 Star Rating.

155. CMS's unlawful determination of Blue Cross NC's Star Rating at 4.0 Stars, as well as its unlawful determination of measures identified above at below 4.0 Stars, has also caused harm to Blue Cross NC's reputation and goodwill in the marketplace, which harm will compound if it is left in place.

156. Star Ratings (both measure-specific and overall) are publicized on CMS's website, and CMS informs beneficiaries that Star Ratings reflect a plan's quality.

157. By assigning Blue Cross NC a 4.0 Star Rating for Contract No. H3449, and the individual measure ratings discussed above, CMS has erroneously indicated to beneficiaries that Blue Cross NC plan quality is inferior to that of other competing plans with higher Star Ratings.

**COUNT I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT IS WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW AND NOT IN ACCORDANCE WITH LAW**
**Violation of 5 U.S.C. § 706**

158. Paragraphs Nos. 50 to 157 are incorporated by reference as if set forth in full herein.

159. The APA prohibits Defendants from acting in any way that is without observance of procedure required by law or not in accordance with law. 5 U.S.C. § 706(2)(A), (C), (D).

160. Congress has mandated that CMS must engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Allina*, 587 U.S. at 570 (quoting 42 U.S.C. § 1395hh(a)(2)).

161. CMS did not engage in notice-and-comment rulemaking and codify "by regulation" in the Code of Federal Regulations several measures and their specifications

that it applied to Blue Cross NC in determining its 2027 Star Ratings: Complaints about the Health Plan (C27), Members Choosing to Leave the Plan (C28), Plan Makes Timely Decisions About Appeals (C30), Reviewing Appeals Decisions (C31), Call Center – Foreign Language Interpreter / TTY (C32), Call Center – Foreign Language Interpreter / TTY (D01), Complaints about the Health Plan (D02), Members Choosing to Leave the Plan (D03), Rating of Drug Plan (D05), Getting Needed Prescription Drugs (D06), MPF Price Accuracy (D07), Medication Adherence for Diabetes Medication (D08), Medication Adherence for Hypertension (D09), Medication Adherence for Cholesterol (D10), Pharmacy Statin Use with Diabetes (D11), Concurrent Use of Opioids and Benzodiazepines (D12), and Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults (D13).

162. Moreover, to the extent that CMS might now claim that it did so, CMS did not comply with its notice and comment requirements in 42 C.F.R. § 422.164(c)(2), (d)(2) or § 423.184(c)(2), (d)(2) either.

163. The Court should set aside Blue Cross NC's unlawful 2027 Star Rating, order CMS to recalculate Blue Cross NC's Star Rating without inclusion of these measures, and award any equitable and injunctive relief necessary to afford rebate relief.

## COUNT II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT IS NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY

### Violation of 5 U.S.C. § 706

164. Paragraphs Nos. 50 to 157 are incorporated by reference as if set forth in full herein.

165. The APA prohibits Defendants from acting in any way that is not in accordance with the law, or that is in excess of statutory authority or short of statutory right. 5 U.S.C. § 706(2)(A), (C).

166. Congress has limited the data on which Star Ratings may be based to data for which a Medicare Advantage plan provides for the collection, analysis, or reporting as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (providing that Star Ratings should be based on "data collected under section 1395w-22(e) of this title").

167. As CMS itself has repeatedly admitted, CMS determines Star Ratings utilizing measures based on data that are not collected under § 1395w-22(e) as part of plans' quality improvement programs. *See, e.g.*, 83 Fed. Reg. at 16,531-32.

168. These measures include Complaints about the Health Plan (C27), Members Choosing to Leave the Plan (C28), Plan Makes Timely Decisions About Appeals (C30), Reviewing Appeals Decisions (C31), Call Center – Foreign Language Interpreter / TTY (C32), Call Center – Foreign Language Interpreter / TTY (D01), Complaints about the Health Plan (D02), Members Choosing to Leave the Plan (D03), Rating of Drug Plan (D05), Getting Needed Prescription Drugs (D06), MPF Price Accuracy (D07), Medication Adherence for Diabetes Medication (D08), Medication Adherence for Hypertension (D09), Medication Adherence for Cholesterol (D10), Pharmacy Statin Use with Diabetes (D11), Concurrent Use of Opioids and Benzodiazepines (D12), and Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults (D13).

169. Because CMS determined Blue Cross NC's 2027 Star Rating based on measures that rely on data not collected under § 1395w-22(e), its action is not in accordance with law, in excess of statutory authority, and short of statutory right. *See* 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 1395w-23(o)(4)(A).

170. The Court should set aside Blue Cross NC's unlawful 2027 Star Rating, order CMS to recalculate Blue Cross NC's Star Rating without inclusion of these measures, and award any equitable and injunctive relief necessary to afford rebate relief.

## PRAYER FOR RELIEF

WHEREFORE, Blue Cross NC respectfully requests that this Court enter judgment in its favor and grant the following relief:

i) A declaration pursuant to 28 U.S.C. § 2201 that the use of the following measures to determine Blue Cross NC's 2027 Star Ratings was unlawful and in violation of the APA: Complaints about the Health Plan (C27), Members Choosing to Leave the Plan (C28), Plan Makes Timely Decisions About Appeals (C30), Reviewing Appeals Decisions (C31), Call Center – Foreign Language Interpreter / TTY (C32), Call Center – Foreign Language Interpreter / TTY (D01), Complaints about the Health Plan (D02), Members Choosing to Leave the Plan (D03), Rating of Drug Plan (D05), Getting Needed Prescription Drugs (D06), MPF Price Accuracy (D07), Medication Adherence for Diabetes Medication (D08), Medication Adherence for Hypertension (D09), Medication Adherence for Cholesterol (D10), Pharmacy Statin Use with Diabetes (D11), Concurrent Use of Opioids and Benzodiazepines (D12), and Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults (D13).

ii) An order setting aside and vacating Blue Cross NC's 2027 Star Rating.

iii) An order directing CMS to recalculate Blue Cross NC's 2027 Star Rating.

iv) An order directing CMS to determine Blue Cross NC's 2027 Star Rating as 4.5 Stars for Contract No. H3449.

v) An injunction providing for rebate relief, including an order requiring CMS to facilitate any modified bid documents necessary to effectuate the judgment.

vi) An order awarding Blue Cross NC its costs and attorneys' fees and expenses as allowed by law.

vii) Such other and further relief as the Court deems just and proper.

Dated: November 24, 2026

Respectfully submitted,


<u>*/s/ Jesse M. Errico*</u>
Jesse M. Errico (N.C. Bar No. 62347)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: jess.errico@lw.com

*Counsel for Plaintiff Blue Cross and Blue Shield of North Carolina*

<u>OF COUNSEL:</u>

Andrew D. Prins
(*Special Appearance forthcoming*)
Dorothy M. Canevari
(*Special Appearance forthcoming*)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
dolly.canevari@lw.com

Nicholas L. Schlossman
(*Special Appearance forthcoming*)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email: nicholas.schlossman@lw.com